IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| BRAD WENDT; DONALD KINZIE; and DUSTIN HANSEN, <br><br>      Plaintiffs, <br><br> vs. <br><br> STATE OF IOWA; JEREMY KING, DNR Officer; and BRIAN SMITH, DNR Officer, <br><br>      Defendants. | **No. 4:17-cv-00423–JEG-CFB** <br><br> **ORDER** |

This matter comes before the Court on a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 filed by Defendants State of Iowa (the State) and Iowa Department of Natural Resources (DNR) Officers Jeremy King (King) and Brian Smith (Smith) (collectively, Defendants), ECF No. 34. Plaintiffs Brad Wendt (Wendt), Donald Kinzie (Kinzie), and Dustin Hansen (Hansen) (collectively, Plaintiffs) resist. A hearing was held on May 7, 2019. Plaintiffs were represented by attorney David O'Brien. Defendants were represented by Assistant Iowa Attorney General David Steward and Jacob Larson. The matter is fully submitted and ready for disposition.

## I.   BACKGROUND

### A.   Factual Background[1]

---

[1] "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). "A fact is 'material' if it may affect the outcome of the lawsuit." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

### 1.   Initial Investigation

In the evening of January 10, 2015, Smith received a call from Anita, Iowa resident Gary

Huff (Huff), informing Smith that Wendt and Kinzie had been deer hunting without permission

on Huff's property (the north property) and on the neighboring adjacent property (the south

property).[2]  Huff explained that he owned both properties but was selling the south property on

contract to Brad Barber (Barber), and that Barber retained the hunting rights to the south

property.  Huff informed Smith that Wendt, Kinzie, and a third person in a maroon pickup truck

identified as "Poop" had been working together in pursuing and hunting deer.  According to

_____

that version of the facts for purposes of ruling on a motion for summary judgment."  Scott, 550
U.S. at 380.

   [2] Plaintiffs challenge statements in Smith's and King's affidavits that refer to their reports,
filed complaints, and witness statements as being inadmissible hearsay statements.  Plaintiffs
similarly challenge other witness statements, collected by Smith and King during the investi-
gation, as being inadmissible hearsay statements.  Defendants argue the affidavits and statements
are not hearsay because they are not being presented for the truth of any matter asserted, but
instead to explain the scope of Defendants' investigation and development of probable cause.
   Affidavits based on hearsay cannot defeat a summary judgment motion.  See Cronquist v.
City of Minneapolis, 237 F.3d 920, 927 (8th Cir. 2001).  However, "[w]here an out-of-court
statement is offered not for the truth of the matter asserted but rather 'to explain the reasons for
or propriety of a police investigation,' then it is not hearsay."  United States v. Shores, 700 F.3d
366, 374 (8th Cir. 2012) (quoting United States v. Malik, 345 F.3d 999, 1002 (8th Cir. 2003)).
In addition, "officials may rely on hearsay statements to determine that probable cause exists."
Carpenter v. Gage, 686 F.3d 644, 649 (8th Cir. 2012) (citing Illinois v. Gates, 462 U.S. 213, 241-
42 (1983)); see Ratliff v. City of Shannon Hills, 52 F. Supp. 3d 904, 911 (E.D. Ark. 2014) (deter-
mining that a dispatcher's statements recorded in a police officer's report were "not hearsay
because they [we]re not offered for the truth of the matter asserted but to show their effect on the
'hearer,'" and that "[e]ven if the dispatcher's statements [we]re hearsay, they still [we]re
admissible to show probable cause" (citing Carpenter, 686 F.3d at 649)).
   In the present case, the facts underlying the criminal investigation are relevant in
determining whether the investigation passes constitutional review.  Statements submitted by
Defendants do not constitute hearsay as they are not offered for the truth of the matter asserted,
but to explain how Defendants conducted the investigation.  See United States v. Tenerelli, 614
F.3d 764, 772 (8th Cir. 2010) (affirming the district court's ruling that the officer's statements
regarding his own observations during the confidential informant's controlled buy were not
admitted for the truth of the matter asserted and were therefore not hearsay).

Huff, while Wendt and Kinzie were driving on the south property and shooting onto the north property, Barber and his son, T.J. Barber (T.J.), confronted Wendt and Kinzie.  Huff said shots had been fired from the maroon pickup, which was on the westbound on-ramp of Interstate 80 near the Anita, Iowa exit.  Smith told Huff he would have to discuss the trespass on the south property with Barber.  Smith advised Huff he would be out to the property the next day to follow up on the investigation.

On January 11, 2015, Smith and Huff walked the fence line between the Huffs' and the Barbers' properties.  Smith took photos of tire tracks, discarded shot gun shells, and a severed barbed wire fence, which he logged in the case activity report.  Smith observed tire tracks in the snow but no footprints, which indicated to Smith that the shotgun had been fired from inside the vehicle.  Smith collected the shotgun shells and the barbed wire and left a "Trespass Complaint Statement" (trespass form) and an "Iowa DNR Law Enforcement Bureau Statement" (witness statement) for Huff, Karin Huff (Huff's wife), Barber, and T.J. to complete.

On January 14, 2015, Smith returned to the properties to collect the completed forms. Huff and Barber had each completed and signed a trespass complaint and a witness statement; Karin Huff and T.J each completed and signed a witness statement.  Barber's witness statement provided that when they (presumably Barber and T.J.) heard shots being fired from their property, they went to investigate and found Wendt and Kinzie in a white pickup on their property.  Wendt, who was driving, explained that Corey Stephenson (Stephenson)—who rented the property from Barber—had given Wendt permission to hunt the property.  Barber told Wendt that Barber retained the hunting rights to the property and that Wendt needed Barber's per- mission, not Stephenson's.  In his witness statement, Huff indicated that he telephoned Stephenson and asked if he had given permission to hunt the land and that Stephenson responded

3

that he did not give permission and could not give permission to hunt someone else's land.  T.J.'s witness statement similarly recounted that Wendt and Kinzie said Stephenson had given them permission to hunt but that Barber told them he retained the hunting rights.  T.J. also stated that he heard shots fired from the maroon truck while it was stopped on the Anita on-ramp to Interstate 80 and then saw the truck drive back up the ramp.  T.J. noted that Wendt and Kinzie referred to the driver of the maroon truck as "Poop."  Smith and King, who was assisting with the investigation, were able to determine "Poop" was Dustin Hansen.

On January 21, 2015, King interviewed Hansen and Kinzie; Kinzie's interview was recorded but Hansen's interview was not.  Kinzie admitted that on January 10, 2015, he had been hunting with Wendt and Hansen, and they were in two separate vehicles to flush deer toward each other.  This corroborated the other witnesses' statements.  Also on January 21, Smith contacted Myles McDermott (Myles) in Audubon County about trespass allegations against Wendt and Kinzie.  Smith advised that Myles' father, Mike McDermott (Mike), who owned the property where the alleged trespass occurred, would need to be the one to complete a trespass form if trespass charges were to be pursued.  On January 28, 2015, Smith met with Myles and provided him with the trespass form and witness statement.  Smith collected the completed forms on February 5, 2015.

On March 13, 2015, Smith received a complaint from Duane Murphy (Murphy), who alleged that on January 10, 2015, he saw a person in a maroon truck shoot at a doe from the roadway out the window of the truck.  On September 5, 2015, Smith met with Murphy and, after Smith showed Murphy a photo lineup, Murphy identified Hansen as the person he saw driving the maroon truck on January 10, 2015.  Murphy completed and signed a witness statement, which Smith picked up on October 5, 2015.  In his statement, Murphy indicated that on January

4

10, 2015, when he heard shots fired, he observed a maroon pickup and approached its occupants, one of whom Murphy saw shooting at deer from the vehicle. Murphy warned them to stop shooting from the road and onto his property.

The barbed wire Smith collected from Huff's property was sent to the Iowa Department of Criminal Investigation's (DCI) lab for analysis. The DCI report dated October 16, 2015, showed that the wire tested positive for lead, indicating damage from gunfire.[3] The shotgun shells Smith collected were never specifically matched to a gun used by Plaintiffs.

On October 21, 2015, the Cass County Attorney, David Wiederstein (Wiederstein), applied for, and obtained, a subpoena duces tecum for the cell phone records of Wendt, Kinzie, and Hansen. Wiederstein sought the records to corroborate Kinzie's statement that the three men were communicating via text message or cell phone calls during the hunt on January 10, 2015.[4] The subpoena requested the cell phone records for January 3, 2015, to January 18, 2015.

DNR reports obtained during the investigation showed that Wendt and Kinzie both registered antlered-buck deer kills on January 10, 2015, and that Hansen registered his kill the following day, January 11, 2015.

### 2. Issuance of Criminal Citations

Based upon the evidence produced during the investigation, Smith prepared criminal citations against Wendt, Kinzie, and Hansen. On December 9, 2015, DNR Senior Sergeant

---

[3] Defendants note that this is consistent with Huff's and Barber's witness statements that Wendt and Kinzie were firing over property fence lines, and with Kinzie's admission that they "shotted" the ditch to get the deer moving.

[4] Plaintiffs deny this statement, arguing "Kinzie claimed just the opposite—that they were not illegally communicating via cell phone." Pls.' Resp. Defs.' Stmt. Mat'l Facts ¶ 34, ECF No. 42-1. However, Defendants' statement makes no mention of the legality of the Defendants' alleged cell phone communications, only that the three were communicating by cell phone during the hunt.

David Tierney (Tierney) and DNR Conservation Officer Gary Sisco served ten citations on Wendt; Smith served ten citations on Kinzie; and King served eleven citations on Hansen. The DNR sent out a news release regarding the charges filed against Wendt, Kinzie, and Hansen.

Nine of the citations against Wendt were issued by Cass County: one for discharging a firearm in a reckless manner; two for trespass; two for illegal take of antlered deer—use of motor vehicle; two for the illegal take of antlered deer—use of two-way communication; one for use of two-way communication to hunt deer; and one for illegal attempt to take deer—use of motor vehicle. The tenth criminal citation issued against Wendt was in Audubon County for trespass.

Nine citations against Kinzie were issued by Cass County: two for trespass; one for discharging a firearm in a reckless manner; one for use of two-way communication to hunt deer; one for illegal attempt to take deer—use of motor vehicle; one for illegal take of deer—use of motor vehicle; one for illegal take of antlered deer—use of two-way communication; one for illegal take of buck deer—use of two-way communication; and one for illegal take of antlered deer—use of motor vehicle. The tenth criminal citation issued against Kinzie was in Audubon County for trespass.

Eleven citations against Hansen were issued by Cass County: one for discharging a firearm in a reckless manner; two for illegal take of buck deer—use of two-way communication; two for illegal take of buck deer—use of motor vehicle; one for shooting firearm over water, highway, or railroad; one for violating one-way traffic designation; one for improper use of median, curb, or access highway; two for illegal attempt to take of deer—use of motor vehicle; and one for illegal attempt to take deer—use of two-way communications. During Hansen's interview, King told Hansen charges against him would be dropped if he testified against Wendt and Kinzie.

### 3.  Facebook Records

On December 17, 2015, King presented applications for search warrants to a Cass County judge seeking Facebook records for Wendt, Kinzie, and Hansen from December 1, 2012, through December 17, 2015.  Attached to each application was a statement by King that on January 10, 2015, Plaintiffs (1) used trucks and mobile communication to illegally hunt and harvest deer in Cass and Audubon Counties; (2) recklessly discharged firearms; and (3) uploaded pictures and comments to Facebook, which would provide crucial evidence to corroborate statements from witnesses, members of the hunting party, and evidence gathered by the investigating officers. The statement also listed certain charges that may result from the issuance of the warrant.  Along with the application was a statement by Victoria Deuel (Deuel), who reported that in January 2013 she saw a Facebook photo of Wendt with a dead deer that had a disturbing caption, which lead Deuel to believe Wendt had committed hunting violations.

A Cass County judge issued the search warrants on December 17, 2015.  The searched Facebook posts contained photos uploaded on January 10, 2015, picturing Wendt, Kinzie, and Hansen posing by a truck with harvested buck.  Prior to that time, King sent Wendt a friend request on Facebook under the fictitious user name Jeremiah Loose; Wendt accepted the request, thus allowing King access to public information on Wendt's Facebook account.

### 4.  December 17, 2015 Text Messages from Smith to King

On December 17, 2015—eight days after the charges were filed against Wendt, Kinzie, and Hansen and the same day King obtained the Facebook search warrants—Smith sent at least two text messages to King.  The first text was a message Smith forwarded to King from Adair County Deputy James Paup sent at 8:29 p.m. saying "good work on those three guys.  I was glad

to see that finally happen." Defs.' App. 46, ECF No. 34-2. The second text, sent at 9:43 p.m., stated, "[t]he tracker has been removed." Id.

Plaintiffs argue that because the first text clearly refers to the Plaintiffs, the second must also, and it proves that Defendants placed a tracker on Wendt's vehicle. Defendants explain that the tracker mentioned in Smith's text message was part of a different investigation into the report of a deer hanging in the garage of a man whose hunting privileges had been suspended and was suspected to be using his truck to illegally hunt and transport deer. With their motion for summary judgment, Defendants submitted the warrant for the tracking device application filed by Tierney and the order granting the warrant. Both the application and the order were dated November 11, 2015. On December 17, 2015, Smith received a message relaying that the device had been removed and then forwarded that message to King. On December 18, 2015, Smith filed a "Return of Search Warrant Tracking Device," which "constitute[d] a completion of the actions taken" under the warrant. Defendants deny ever placing a tracking device of any kind on any of the Plaintiffs' vehicles. Defs.' App. 47, ECF No. 34-2.

### 5. Resolution of Criminal Charges

The Cass County and Audubon County Attorneys prosecuted the charges against Plaintiffs. On June 21, 2016, Dustin Hansen's case proceeded to a bench trial. Cass County Iowa Magistrate Judge Karen Mailander issued a trial order on August 30, 2016, finding the State had not met its burden of proving the hunting-related charges against Hansen but had met its burden on the traffic violations.

At some time prior to November 2016, the Cass County Attorney dismissed all charges against Wendt and Kinzie, with the exceptions of one charge of illegal take of deer by motor vehicle and the charges for trespass on Barber's property. On November 29, 2016, Wendt's and

Kinzie's cases proceeded to trial on the remaining Cass County charges.  The State called Barber

to testify.  During Barber's testimony, it came to light that Barber did not explicitly reserve all

hunting rights and that Stephenson was prepared to testify that he had given Wendt and Kinzie

permission to hunt.  After direct and cross examination, the Cass County Attorney moved to

dismiss all remaining charges.  Thereafter, due to the sudden retirement of the Audubon County

Attorney, the Cass County Attorney assumed control of the Audubon County trespass charges

against Wendt and Kinzie and dismissed those charges.

### B.   Procedural History

On November 30, 2017, Plaintiffs filed a five-count Complaint, naming the State of Iowa,

Smith, and King as Defendants.  On June 19, 2018, Plaintiffs filed an Amended Complaint

adding factual allegations.  On Defendants' motion to dismiss, several counts were dismissed by

the Court's order of July 26, 2018, including various state law torts claims.  Order, Wendt v.

Iowa, No. 4:17-cv-00423 (S.D. Iowa July 26, 2018), ECF No. 28.[5]

Two counts remain against the Defendants.  Count I alleges Defendants violated Plain-

tiffs' rights under the Fourth Amendment of the U.S. Constitution and under article I, § 8 of the

Iowa Constitution: (1) by unlawfully placing a GPS tracking device on Wendt's vehicle; and

(2) by unlawfully and without probable cause obtaining search warrants and subpoenas for Plain-

tiffs' Facebook and cell phone records, respectively.  Count II alleges Defendants violated

Plaintiffs' right to substantive due process, particularly their right in obtaining fair criminal

proceedings, as guaranteed by the Fourteenth Amendment of the U.S. Constitution and article I,

---

[5] The Court dismissed that portion of Count I that alleged Defendants violated the Fourth Amendment of the U.S. Constitution and article 1, § 8 of the Iowa Constitution by citing them for criminal behavior without probable cause.  The Court also dismissed Counts III, IV, and V for defamation, false arrest, and malicious prosecution, respectively.

§ 9 of the Iowa Constitution.  As revised in Plaintiffs' amended complaint, the claims against King and Smith are brought in their individual capacities only.  Plaintiffs seek compensatory and punitive damages.  Compare Compl. ¶¶ 9-10, ECF No. 1, with Am. Compl. ¶¶ 9-10, ECF No.22.

On December 7, 2018, Defendants filed the present Motion, arguing they are entitled to summary judgment on both counts.  Plaintiffs resist the Motion in all respects.

## II.   DISCUSSION

### A.   Standard for the Motion

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'"  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the movant makes such a showing, to avoid summary judgment the nonmovant must "set out 'specific facts showing that there is a genuine issue for trial.'"  Id. (quoting Celotex, 477 U.S. at 324).  A genuine issue for trial requires more than "some metaphysical doubt as to the material facts."  Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)).  The Court views the facts presented on summary judgment in the light most favorable to the nonmovant.  Matsushita, 475 U.S. at 586.

### B.   Qualified Immunity

As an essential point of departure, "[q]ualified immunity shields a government official from suit under § 1983 if his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Kelsay v. Ernst, 933 F.3d 975,

at *2 (8th Cir. Aug. 13, 2019) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818

(1982)).  "[W]hether an official protected by qualified immunity may be held personally liable

for an allegedly unlawful official action" is "assessed in light of the legal rules that were 'clearly

established' at the time it was taken" and "generally turns on the 'objective legal reasonableness'

of the action."  Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Harlow, 457 U.S. at

818-19).  The Supreme Court has explained that "the same standard of objective reasonableness

that [it] applied in the context of a suppression hearing in [United States v. Leon, 468 U.S. 897,

916 (1984)] defines the qualified immunity accorded an officer."  Groh v. Ramirez, 540 U.S.

551, 565 n.8 (2004) (quoting Malley v. Briggs, 475 U.S. 335, 344 (1986)); see also Gordon ex

rel Gordon v. Frank, 454 F.3d 858, 864 (8th Cir. 2006) (reasoning immunity law allows an

officer to make a mistake, but the "mistake must be objectively reasonable" (citing Groh, 540

U.S. at 567)).

   "A clearly established right is one that is 'sufficiently clear that every reasonable official

would have understood that what he is doing violates that right.'"  Mullenix v. Luna, 136 S. Ct.

305, 308 (2015) (quoting Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)).  "While [the

Supreme] Court's case law 'do[es] not require a case directly on point' for a right to be clearly

established, 'existing precedent must have placed the statutory or constitutional question beyond

debate.'"  White v. Pauly, 137 S. Ct. 548, 551 (2017) (second alteration in original) (quoting

Mullenix, 136 S. Ct. at 308).  "In other words, immunity protects 'all but the plainly incompetent

or those who knowingly violate the law.'"  Id. (quoting Mullenix, 136 S. Ct. at 308)).  The

Supreme Court has repeatedly instructed courts "not to define clearly established law at a high

level of generality."  Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011) (collecting cases).  Rather,

"the clearly established law must be 'particularized' to the facts of the case.  Otherwise,

'[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." White, 137 S. Ct. at 552 (internal citation omitted) (quoting Anderson, 483 U.S. at 640)).  Determining whether a right is clearly established requires "identify[ing] a case where [the official] acting under similar circumstances . . . was held to have violated the [a Constitutional right]." Id.; see also District of Columbia v. Wesby, 138 S. Ct. 577, 589-90 (2018) ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" (cleaned up) (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991) (per curiam) and al-Kidd, 563 U.S. at 741-42)).[6]

---

[6] In Pearson v. Callahan, 555 U.S. 223, 232 (2009), the Supreme Court abolished the sequential two-step protocol mandated by Saucier v. Katz, 533 U.S. 194, 201 (2001), which required a court to first determine "whether the facts alleged show the officer's conduct violated a constitutional right."  The Pearson Court reasoned that instead, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 236.

Despite this stated discretion, subsequent decisions by the Court have repeatedly reasoned that when addressing questions of qualified immunity, it is rare for the constitutional violation prong to be decided first. See, e.g., al-Kidd, 563 U.S. at 735 (noting that "Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case'" but because the court of appeals below analyzed both prongs of the qualified immunity analysis, the Court was required to correct both the wrongly decided constitutional-law question and what was held to be clearly established law but was not); see also, e.g., Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) (per curiam) (reversing the court of appeals concluding it was not clearly established that the officer's use of force would violate the Fourth Amendment because "use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue" (quoting Mullenix, 136 S. Ct. at 309)); White, 137 S. Ct. at 551-53 ("[T]he clearly established law must be 'particularized' to the facts of the case." (quoting Anderson, 483 U.S. at 640)); Messerschmidt v. Millender, 565 U.S. 535, 549, (2012) (concluding the officers' conduct was objectively reasonable, reasoning even if the

The Iowa Supreme Court held that qualified immunity could apply to Iowa constitutional

tort claims, such as search and seizure violations, but that the standard differs from the federal

qualified immunity standard.  See Baldwin v. Estherville, 915 N.W.2d 259, 260-61 (Iowa 2018)

(noting that in Godfrey v. State, 898 N.W.2d 844, 846-47 (Iowa 2017), the court "held that the

---

officers' judgment that the scope of the warrant was supported by probable cause was mistaken, it was not plainly incompetent).

      Recent Eighth Circuit opinions reveal a divide regarding the qualified immunity analysis. Compare, e.g., Robinson v. Hawkins, __ F.3d __, No. 18-1823, 2019 WL 4196347, at *5 (8th Cir. Sept. 5, 2019) (Sheperd, J., author) (concluding the officer "[wa]s entitled to qualified immunity because it [wa]s not clearly established that the amount of force [she] used against [the plaintiff] [wa]s excessive," but affirming the denial of qualified immunity on the plaintiff's unreasonable search claim reasoning, the law regarding strip searches was "sufficiently clear to inform [the officer] her search of [the plaintiff] was unlawful both in scope and manner"), with id. at *8 (Smith, C.J., concurring in part and dissenting in part) (concurring with the denial of qualified immunity as to the unreasonable search claim but dissenting on the grant of qualified immunity on the excessive force claim, reasoning "[e]xisting precedent put [the officer] on notice that her use of force in the context of a strip search was unlawful"), and id. at *11 (Colloton, J., concurring in part and dissenting in part) (concurring with the grant of qualified immunity on the excessive force claim but dissenting from the denial of qualified immunity on the unreasonable search claim, reasoning the precedent relied on by the majority did not give the officer "fair warning that a search conducted with a sanitary glove would be declared unreasonable based on the condition of the surrounding area," and therefore the law was not clearly established). Compare also, e.g., Kelsay, 933 F.3d 975, at *3 (Colloton, J., author) (reversing the district court's denial of qualified immunity on an excessive force claim, reasoning "[i]t was not clearly established in May 2014 that a deputy was forbidden to use a takedown maneuver to arrest a suspect who ignored the deputy's instruction to 'get back here' and continued to walk away from the officer"), with id. at *9 (Grasz, J., dissenting) ("We should exercise our discretion at every reasonable opportunity to address the constitutional violation prong of qualified immunity analysis, rather than defaulting to the 'not clearly established' mantra, where, as here, such analysis is not an 'academic exercise,' and where it is 'difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be.'" (internal citation omitted) (quoting Pearson, 555 U.S. at 237)). Compare also, e.g., Swearingen v. Judd, 930 F.3d 983, 988 (8th Cir. 2019) (Colloton, J., author) (concluding that in a situation "fairly described as tense and rapidly evolving," it cannot be said that the officer's "use of deadly force, even if just over the line of reasonableness, violated a clearly established right"), with id. at 988-89 (Erickson, J., concurring in the judgment) (distinguishing that "[the officer]'s "mistaken perception or belief that [the decedent] posed a threat of serious physical harm to [the officer] or any of the other officers was objectively reasonable in this particular case due to the close proximity between the officers and [the decedent], and because the positioning of the knife was such that it that could have been readily modified to pose an imminent threat to the officers").

State of Iowa and state officials acting in their official capacities could be sued directly for violating . . . article I, section 9 (the Iowa due process clause), where state law does not provide an adequate compensatory damage remedy," but that the Godfrey court did not reach the qualified immunity question).[7]  In determining the proper standard for evaluating qualified immunity, the Baldwin court reviewed its own precedent and reasoned a standard akin to "strict liability would go too far."  See Baldwin, 915 N.W.2d at 275-79 (citing, inter alia, Dickerson v. Mertz, 547 N.W.3d 208, 210-11 (Iowa 1996), which was an action against DNR officers for violation of due process by issuing citations for hunting without a valid license and taking a deer by auto, for which the plaintiff was later acquitted, were entitled to qualified immunity on the federal constitutional claims because the plaintiff failed to raise "a factual issue concerning the unreasonableness of defendants' actions").

---

[7] Plaintiffs brought their constitutional claims in Counts I and II under both the U.S. and Iowa Constitutions.  In ruling on Defendants' Motion to Dismiss, citing both Godfrey and Baldwin, this Court specifically noted that Iowa qualified immunity standard differs from the federal qualified immunity standard.  See July 26, 2018 Order 9-10, ECF No. 28.  However, in resistance to Defendants' Motion for Summary Judgment, Plaintiffs focus on the federal law standard, mentioning only in passing that "in assessing [the unreasonable search] claim under the Iowa Constitution, note that the Iowa Supreme parted ways with federal unreasonable search precedent in State v. Cline, 617 N.W.2d 277, 293 (Iowa 2000)[, overruled on other grounds by State v. Turner, 630 N.W.2d 601, 666 (Iowa 2001)], refusing to recognize a 'good faith exception to the exclusionary rule' under the Iowa Constitution."  Pls.' Resist. Br. 27, ECF No. 42.  Despite having been apprised of the difference in Iowa's qualified immunity standard as set forth in Baldwin, the parties failed to brief the issue.  Nonetheless, in considering Defendants' entitlement to qualified immunity, the Court analyzes Iowa's qualified immunity standard as it applies to Plaintiffs' Iowa Constitutional claims.  Barkley, Inc. v. Gabriel Bros., Inc., 829 F.3d 1030, 1041 (8th Cir. 2016) ("Federal district courts have power to grant summary judgment *sua sponte* when the losing party is given sufficient advance notice and an adequate opportunity to submit evidence in opposition." (quoting Chrysler Credit Corp. v. Cathey, 977 F.2d 447, 449 (8th Cir. 1992) (per curiam))); see also Baldwin v. Estherville, 333 F. Supp. 3d 817, 844-45 (N.D. Iowa 2018) (same).

After considering its own precedent and the qualified immunity standards established by other state jurisdictions, the <u>Baldwin</u> court concluded "qualified immunity should be shaped by the historical Iowa common law as appreciated by our framers and the principles discussed in Restatement (Second) of Torts section 874A," which "means due care as the benchmark." <u>Id.</u> at 280.  The court established that

> a government official whose conduct is being challenged will not be subject to damages liability if she or he pleads and proves as an affirmative defense that she or he exercised all due care to conform to the requirements of the law.

<u>Id.</u> at 281.  In processing the Iowa Supreme Court's "all due care" standard, the federal district court in <u>Baldwin v. Estherville</u>, 333 F. Supp. 3d 817, 844-45 (N.D. Iowa 2018), reasoned the factors a court may consider in determining whether the "all due care" qualified immunity defense applies, include "bad faith," "malice and lack of probable cause," and lack of "reasonable ground" for the conduct in question.  The district court in <u>Baldwin</u> reasoned that "in the absence of genuine issues of material fact—the question of 'all due care' immunity can be decided by the trial court at summary judgment as a matter of federal law." <u>Id.</u> (citing <u>Cremona v. R.S. Bacon Veneer Co.</u>, 433 F.3d 617, 619-20 (8th Cir. 2006) ("Because this case involves only questions of law, it is particularly appropriate for summary judgment.)).

### C.   Count I:  Unreasonable Searches

Plaintiffs allege by placing a GPS tracking device on Wendt's vehicle and unlawfully obtaining search warrants for their Facebook accounts and cell phone records, Defendants violated Plaintiffs' rights under the Fourth Amendment of the U.S. Constitution and under article I, § 8 of the Iowa Constitution.  The Fourth Amendment, as applied to the states through the Fourteenth Amendment, protects the right of people to be secure "against unreasonable searches and seizures."  U.S. Const. amend IV,  Article 1, § 8 of the Iowa Constitution likewise provides,

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized."

### 1. GPS Tracking Device

Plaintiffs' Count I alleges Defendants attached a GPS tracking device to Wendt's vehicle without a warrant, in violation of the Fourth Amendment and article I, § 8 of the Iowa Constitution. Defendants argue summary judgment is appropriate on this claim because King and Smith *did not* place a GPS tracking device on Wendt's vehicle, and Plaintiffs have no evidence that such placement ever occurred.

"[T]he Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements," is a search under the Fourth Amendment, requiring probable cause and a warrant. United States v. Jones, 565 U.S. 400, 404 (2012); see also United States v. Faulkner, 826 F.3d 1139, 1144 (8th Cir. 2016) ("Placement of a GPS tracking device on a vehicle is a 'search' within the meaning of the Fourth Amendment, requiring probable cause and a warrant.").

In resisting summary judgment and arguing there is a fact issue for trial that the Defendants installed a GPS tracker on Wendt's vehicle, Plaintiffs provide only their own affidavits. Wendt attested that "[f]inding out about the GPS tracker illegally placed on my truck during discovery in this case solved a mystery for me because I often wondered during the 2015 hunting season how the Defendants seemed to know every time I was out hunting and where I was." Wendt Aff. ¶ 12, App. 5, ECF No. 42-3. Hansen similarly attested that "[a] tracking device on Brad's truck explains how the Defendants always seemed to be aware of when and where I was

hunting whenever I hunted with Brad.  When hunting with Wendt you just knew that the chances of getting pulled over and checked by DNR were much higher."  Hansen Aff. ¶ 16, App. 11, ECF No. 42-3.  Likewise, Kinzie attested that "[a] tracking device on Brad's truck explains how the Defendants always seemed to be aware of when and where I was hunting whenever hunted with Brad. . . . I always thought that was strange."  Kinzie Aff. ¶ 13-14, App. 16, ECF No. 42-3. None of the Plaintiffs attested to seeing or otherwise detecting a GPS device on Wendt's vehicle.

The Eighth Circuit has consistently held "that a conclusory, self-serving affidavit will not defeat an otherwise meritorious summary judgment motion."  Keiran v. Home Capital, Inc., 858 F.3d 1127, 1132 (8th Cir. 2017); Chavero-Linares v. Smith, 782 F.3d 1038, 1041 (8th Cir. 2015) ("[T]he plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." (quoting Frevert v. Ford Motor Co., 614 F.3d 466, 473-74 (8th Cir. 2010))).  Furthermore, Plaintiffs' affidavits allege no personal knowledge that a GPS tracker was ever placed on Wendt's vehicle.  Instead, their affidavits merely provide conclusory, speculative remarks about what a tracker on Wendt's vehicle would explain.  Plaintiffs have not presented any material facts sufficient to create a genuine issue for trial.  Chavero-Linares, 782 F.3d at 1041.

Plaintiffs further argue the text messages sent from Smith to King on December 17, 2015, are evidence that Defendants placed a GPS tracker.  They argue the second text's indentation and location "just below the congratulatory text" shows that the second message, about the removal of a tracking device, was related to Plaintiffs.  Pls.' Resist. Br. 15, ECF No. 42.  Plaintiffs also argue the timing of the messages corresponds to the timing of news releases related to the case, thus implying they are related exclusively to the criminal matters underlying this case.  Defen-dants counter that the text message about a tracker being removed was about an entirely separate

case.  To support this argument, Defendants provide an affidavit from Officer Smith as well

three documents—Application for Search Warrant Mobile Tracking Device, Search Warrant for

Placement of Mobile Tracking Device, and Return of Search Warrant Mobile Tracking Device—

all for a criminal case regarding an individual that is *not* a party in this case.  Defendants argue

the documents establish that the search warrant in the *other* case was applied for, and issued, on

November 11, 2015, and that the device was filed as returned on December 18, 2015.  Plaintiffs

rebut that these criminal filings are "cover" and that they establish Smith "**placed** a tracker on

another vehicle on December 18, 2015."  Pls.' Resist. Br. 16, ECF No. 42.

Plaintiffs' speculative interpretation that the text message regarding the removal of a GPS

tracking device must be referring to Wendt's vehicle is unsupported by any evidence in the

record.  On the other hand, Defendants presented documentary evidence demonstrating that the

reference in the text message relates to the *return* and *completion* of a GPS tracker used in an

unrelated criminal case.  Plaintiffs offer no more than mere conjecture in attempt to rebut

Defendants' evidence.  "Although a district court must rule on a motion for summary judgment

after viewing the facts in the light most favorable to the non-moving party, it is not required to

'accept unreasonable inferences or sheer speculation as fact.'"  Reed v. City of St. Charles, 561

F.3d 788, 791 (8th Cir. 2009) (quoting Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800

(8th Cir. 2004)).

Plaintiffs' allegation that Defendants placed a GPS tracker on Wendt's vehicle is, at best,

speculative and contradicts all objective evidence in the record.  "When opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a

motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).  No reasonable jury,

when looking at this record, could find for the nonmoving party on this issue. Matsushita, 475 U.S. at 587. Thus, because there is no evidence in the record to support Plaintiffs' allegation that Defendants placed a GPS tracker on Wendt's vehicle, that portion of Count I must be dismissed. See DePriest v. Milligan, 823 F.3d 1179, 1184 (8th Cir. 2016) ("To survive summary judgment, [] plaintiff[s] 'must substantiate [their] allegations with sufficient probative evidence that would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" (quoting Rickard v. Swedish Match N. Am., Inc., 773 F.3d 181, 184 (8th Cir. 2014)).

### 2. Searches

Count I also alleges Defendants violated Plaintiffs' right to be free from unreasonable search by obtaining Plaintiffs' cell phone and Facebook records through warrants that were invalidly issued. Defendants argue summary judgment should be granted because the undisputed facts show the cell phone records were obtained by proper subpoenas duces tecum, and the warrant applications for the Facebook records provided the issuing judge with sufficient information to determine probable cause existed. Plaintiffs disagree, arguing the Facebook warrants lacked probable cause and were overbroad and that the cell phone warrants were similarly unlawful.

In denying in part Defendants' motion to dismiss Count I as to Plaintiffs' unreasonable search claim, this Court reasoned a more fully developed record was necessary to determine whether Defendants were entitled to qualified immunity. See July 26, 2018 Order 16-18, ECF No. 28. Based on the current record, the Court now makes that determination.

"[T]he Supreme Court's opinion in Messerschmidt v. Millender guides [the Court's] analysis of qualified immunity where an alleged Fourth Amendment violation involves a search or seizure conducted pursuant to a warrant." Kiesling v. Holladay, 859 F.3d 529, 533 (8th Cir.

2017) (citing <u>Messerschmidt v. Millender</u>, 565 U.S. 535 (2012)).  "[T]he <u>Messerschmidt</u> Court recognized that a warrant generally confers a 'shield of immunity' to officers acting within the scope of its authority."  <u>Id.</u> (citing <u>Messerschmidt</u>, 565 U.S. at 546-48).  Although officers are not "automatically entitled to qualified immunity because a magistrate approved a warrant application," the Supreme Court has repeatedly stated that "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner."  <u>Id.</u> (citing <u>Messerschmidt</u>, 565 U.S. at 547; <u>Leon</u>, 468 U.S. at 921).  The <u>Messerschmidt</u> Court reasoned:

> [o]ur precedents make clear, however, that the threshold for establishing this exception is a high one, and it should be.  As we explained in <u>Leon</u>, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination" because "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment."

<u>Messerschmidt</u>, 565 U.S. at 547 (quoting <u>Leon</u>, 468 U.S. at 921).

Iowa law requires that a warrant application must "describe the person, place, or thing to be searched and the property to be seized with sufficient specificity to enable an independent reasonable person with reasonable effort to ascertain and identify the person, place, or thing."  Iowa Code § 808.3(1)(b) (2018).  The application may be supported by "oath or affirmation, which includes facts, information, and circumstances tending to establish sufficient grounds for granting the application, and probable cause for believing that the grounds exist."  <u>Id.</u> § 808.3(1)(a).  Probable cause is established where "a reasonably prudent person would believe that . . . evidence of a crime is being concealed" in the place to be searched, <u>State v. Green</u>, 540 N.W.2d 649, 655 (Iowa 1995), and "must rest on a nexus between criminal activity, the thing to be seized and the place to be searched,"  <u>id.</u> (internal quotations and citation omitted).

20

### a. Cell Phone Subpoenas

Plaintiffs allege Defendants collected Plaintiffs' cell phone data through unlawful warrants. The data was collected pursuant to subpoenas duces tecum applied for by Cass County Attorney Wiederstein, who is not a party in this lawsuit. Plaintiffs argue Defendants should nonetheless be held accountable for the lack of probable cause set out in the warrant application because Defendants provided Wiederstein the information contained therein. Defendants counter that the subpoenas met the proper standards and they are entitled to qualified immunity.

Iowa Rule of Criminal Procedure 2.5(6) governs the issuance of subpoenas duces tecum and provides: "The clerk of the district court, on written application of the prosecuting attorney and the approval of the court, shall issue subpoenas including subpoenas duces tecum for such witnesses as the prosecuting attorney may require in investigating an offense . . . ." Pursuant to this rule, investigatory subpoenas must meet requirements different from those governing search warrants. See State v. Kelley, 353 N.W.2d 845, 848-49 (Iowa 1984).

An investigatory subpoena must still satisfy the Fourth Amendment by meeting three requirements:

> (1) the investigation must be for a lawfully authorized purpose although no specific crime need be charged; (2) the documents sought must be relevant to the inquiry; and (3) the items to be produced must be described in a manner permitting the object of the subpoena to properly respond with reasonable effort.

Pattison Bros. Miss. River Terminal v. Iowa Dist. Ct. for Clayton Cty., 630 N.W.2d 782, 787 (Iowa 2001) (quoting Kelley, 353 N.W.2d at 847).

As to the first element, "Courts rarely, if ever, quash a subpoena on the grounds that it was issued for an unlawful purpose. This is because the lawful purpose criterion is satisfied when the county attorney is engaged in a bona fide criminal investigation." Id. (citations omitted). Here, Wiederstein obtained subpoenas for Wendt's, Kinzie's, and Hansen's cell phone records to

corroborate Kinzie's statement that the three men were communicating via text messages or cell phone calls during the hunt on January 10, 2015.  The record shows the subpoenas were issued during a bona fide criminal investigation.  As to the second element, the subpoenas called for Plaintiffs' cell phone records for a limited and defined period: January 3, 2015, to January 18, 2015.  The cell phone data from that period could confirm or contradict Kinzie's statement regarding Plaintiffs' potentially illegal actions and was therefore relevant to the investigation at the time it was requested.  See id. at 788.  Further, "[t]o comply with the third requirement of particularity, the subpoena must adequately describe the documents to be produced to permit the object of the subpoena to adequately respond."  Id.  Here, the specific period allowed the cell phone companies to respond to the request.

Plaintiffs fail to present *any* legal support for their contention that Defendants should be held liable for a subpoena application neither of them submitted.  The subpoena applications requested "[p]hone numbers, incoming and outgoing along with phone numbers regarding text messaging from January 3, 2015 to January 18, 2015 . . . .  in the course of investigating a public offense."  Defs.' App. 56, 63, ECF No. 34-2.  Those records were sought to "corroborate Kinzie's statement indicating the three of them were communicating via texting or cell phone calls during the hunt on January 10, 2015."  Defs.' Stmt. Undisputed Facts ¶ 34, ECF No. 34-1.  It is undisputed Defendants were investigating Plaintiffs' alleged illegal use of cell phones during the January 10 hunt and that each Plaintiff received a citation for the use of two-way communication in the illegal take of antlered deer.  On this record, the Court finds the subpoena applications complied with Iowa law.  Assuming without deciding that Defendants can be held liable under § 1983 and Iowa law for subpoenas duces tecum applications, which neither Defendant personally filed, the Court finds under the circumstances of this case, Defendants' conduct

relating to the securing of those subpoenas was objectively reasonable and performed with all due care.  See Messerschmidt, 565 U.S. at 548-49; Baldwin, 915 N.W.2d at 280.  Defendants are entitled to qualified immunity and this portion of Count I must be dismissed.

### b.  Facebook Warrants

Plaintiffs next allege the Facebook warrants lacked probable cause.  In addition, raised for the first time in resistance to Defendants' Motion for Summary Judgment, Plaintiffs claim that the Facebook warrants were overbroad.  Defendants assert King's affidavit supporting the search warrant applications demonstrated a nexus between the alleged crimes and the Facebook records to be searched and that even if the affidavit failed to establish that nexus, the search warrant remained valid because the information provided would—and did—lead the magistrate to a reasonable belief that probable cause existed to support the search.  Accordingly, Defendants argue they are entitled to qualified immunity because Plaintiffs cannot establish the Facebook warrants violate the law.  Plaintiffs resist, arguing the affidavit includes conclusory and stale statements that fail to allow a magistrate to find probable cause and that the resulting warrants were overbroad.

As the Messerschmidt Court noted, in the context of a § 1983 lawsuit where a plaintiff seeks damages based on defendant law enforcement officers' roles in obtaining and executing a search warrant, "[t]he validity of the warrant is not before [the Court].  The question instead is whether [King] and [Smith] are entitled to immunity from damages, even assuming that the warrant should not have been issued."  Messerschmidt, 565 U.S. at 546.

In his affidavit in support of the Facebook search warrant, King detailed the date the hunt occurred (January 10, 2015) and the purportedly criminal activities (illegally using vehicles and mobile communication to hunt and harvest deer, trespassing, and recklessly discharging a

firearm).  Referencing Duell's letter, the affidavit further stated that there were pictures on Plaintiffs' Facebook accounts that would provide evidence of these illegal activities.  It was "entirely reasonable" for Defendants to rely on the validity of the warrant for Facebook records where the affidavit substantially detailed the evidence sought and what it would tend to show. Cf. United States v. Hallam, 407 F.3d 942, 947 (8th Cir. 2005) (reasoning that based on the totality of circumstances, it was entirely reasonable for the officer to have believed that probable cause existed in support of the search warrant and that the officer "acted in good faith in relying on the county prosecutor and state judge's probable cause determination" (internal quotation marks omitted)).

Plaintiffs also complain that in applying for the Facebook warrants, King deceived the magistrate by not disclosing that he was already monitoring Plaintiffs' Facebook pages under a fictitious name.  Plaintiffs cite no legal support that such monitoring or sharing the information obtained thereby in the warrant application renders the warrants unlawful.  Under Iowa law, when applying for a search warrant, an officer "'is not required to present all inculpatory and exculpatory evidence to the magistrate,' only that evidence which would support a finding of probable cause." State v. Baker, 925 N.W.2d 602, 615 (Iowa 2019) (quoting Green, 540 N.W.2d at 656).  Further, "omissions of fact are misrepresentations only if the omitted facts 'cast doubt on the existence of probable cause.'"  Id. (quoting Green, 540 N.W.2d at 656).  That King had been monitoring the Facebook accounts to no avail does not, on its own, cast doubt on the existence of probable cause.  See id.

Even if the applications for the Facebook search warrants lacked probable cause, Defendants are entitled to qualified immunity as to this claim.  When obtaining a search warrant, an officer's "immunity will be lost only where the warrant application is so lacking in indicia of

24

probable cause as to render official belief in its existence unreasonable." Messerschmidt, 565

U.S. at 553 ("Qualified immunity 'gives government officials breathing room to make reason-

able but mistaken judgments.'  The officers' judgment that the scope of the warrant was

supported by probable cause may have been mistaken, but it was not 'plainly incompetent.'"

(internal citations omitted) (quoting al-Kidd, 563 U.S. at 743; Malley, 475 U.S. at 341)); see also

George v. City of St. Louis, 26 F.3d 55, 57 (8th Cir. 1994).  The applications at issue here are not

so lacking.  Further, under Iowa law, the record shows King used all due care to comply with

§ 808.3 in applying for the warrants.  See Baldwin, 915 N.W.2d at 281.  Therefore, Plaintiffs

have failed to put forth facts sufficient to make out a violation of a statutory or constitutional

right.  Wright, 813 F.3d at 696.

   The Court need not consider Plaintiffs' claim that the Facebook search warrants were over-

broad as that claim was not pleaded in either Plaintiffs' original or amended complaint but was

instead raised for the first time in response to Defendants' motion for summary judgment.  See

Singleton v. Ark. Hous. Auths. Prop. & Cas. Self-Insured Fund, Inc., 934 F.3d 830, 837 (8th Cir.

2019) ("[Although] the pleading requirements under the Federal Rules [of Civil Procedure] are

relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late

into the litigation for the purpose of avoiding summary judgment." (quoting N. States Power Co.

v. Fed. Transit. Admin., 358 F.3d 1050, 1057 (8th Cir. 2004)).

   Defendants are entitled to qualified immunity on Plaintiffs' claim regarding the Facebook

warrants as alleged in Count I.

### D.   Count II: Substantive Due Process

   In Count II, Plaintiffs allege King and Smith, in their individual capacities, violated Plain-

tiffs' substantive due process rights under the Fourteenth Amendment and article I, § 8 of the

Iowa Constitution through arbitrary and wrongful conduct during the criminal investigation. Plaintiffs allege King and Smith wanted to "get Wendt and his hunting partners on some charge, really any charge."  Pls.' Resist. Br. 28, ECF No. 42.  Defendants argue the undisputed facts show King and Smith conducted a thorough and lawful investigation that provided probable cause for the citations eventually issued, and therefore, they are entitled to qualified immunity and their motion should be granted.

"To establish a substantive due process violation, [Plaintiffs] must demonstrate that a fundamental right was violated and that [Defendants'] conduct shocks the conscience." Folkerts v. City of Waverly, 707 F.3d 975, 980 (8th Cir. 2013).  With respect to conduct that is con-science shocking, "[m]ere negligence is never sufficient.  Proof of intent to harm is usually required, but in some cases, proof of deliberate indifference . . . will satisfy this substantive due process threshold." Terrell v. Larson, 396 F.3d 975, 978 (8th Cir. 2005) (en banc).  Among the fundamental rights the Court recognizes is "the interest in obtaining fair criminal proceedings before being denied one's liberty in the most traditional sense." Akins v. Epperly, 588 F.3d 1178, 1183 n.2 (8th Cir. 2009) (quoting Wilson v. Lawrence Cty., 260 F.3d 946, 956 n.8 (2001)). This fundamental right is violated "in the case of a failure to investigate." Id.

For a failure to investigate to rise to the level of a constitutional violation, it must be "intentional or reckless." Folkerts, 707 F.3d at 981 (citing Amrine v. Brooks, 522 F.3d 823, 834 (8th Cir. 2008)).  Where officials "have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly." Wilson, 260 F.3d at 956 n.8.  The reckless standard is appropriate where, as here, the "officers con-ducting the . . . investigation certainly had the luxury of unhurried judgments and repeated reflections." Id. at 957.  As applied in this context, recklessness has a subjective component; that

is, officers must generally be aware of the existence of possibly exculpatory evidence.  Id. at 956 n.9.  The Eighth Circuit has held reckless or intentional failure to investigate shocks the conscience in the following circumstances: "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, [and] (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence."  Akins, 588 F.3d at 1184.

However, where the evidence, at most, shows a negligent failure to investigate factual inconsistencies, other leads, or suspects, substantive due process claims cannot succeed and must be dismissed.  See Clemmons v. Armontrout, 477 F.3d 962, 966 (8th Cir. 2007).  Proof of an officer's "negligent failure to investigate inconsistencies or other leads is insufficient to establish conscience-shocking misconduct."  Akins, 588 F.3d at 1184; see also Clemmons, 477 F.3d at 966 (rejecting the argument that failure to investigate another suspect shocked the conscience because there was "no explanation for why these actions constitute recklessness as opposed to mere negligence").  Not even gross negligence will suffice.  Wilson, 260 F. 3d at 955.

Plaintiffs' primary contention is that Defendants should have interviewed Stephenson regarding whether Stephenson gave permission to Wendt to hunt on the property.  Defendants assert they did not interview Stephenson because Barber, the actual landowner, said Stephenson, the renter, did not retain the hunting rights and had no authority to grant hunting rights.  Plaintiffs assert Defendants failed to interview Stephenson out of incompetence and ill will.

The record shows Defendants' decision to not interview Stephenson, at most, could constitute negligence.  See Folkerts, 707 F.3d at 981 ("A negligent failure to investigate inconsistencies or other leads does not violate due process.").  Defendants' beliefs that Plaintiffs committed various violations were reasonably based on statements by the actual landowners—

Huff and Barber—that Stephenson had no authority to grant hunting rights to Plaintiffs.  More-over, the adequacy of King's and Smith's investigation does not shock the conscience.  King and Smith relied on multiple written and signed statements by witnesses that indicated Plaintiffs were trespassing, using cell phones to illegally hunt and take deer, and shooting at deer from vehicles. The record shows Defendants gathered physical evidence on multiple properties, cell phone records, Facebook photos, witness statements, and DCI reports.  The totality of that evidence gave Defendants reason to believe Plaintiffs violated several provisions of Iowa's fish and game code.  The decision not to interview Stephenson regarding a single trespass allegation—only one of the several violations of Iowa's fish and game code the officer were investigating—was based on a rational process, which is not altered by the hindsight view that it might have been incom-plete.  See Brockinton v. City of Sherwood, Ark., 503 F.3d 667, 675 (8th Cir. 2007) (finding that "[w]hile in hindsight [the defendant officer]'s investigation was not comprehensive," the plaintiff failed to "alleged sufficient facts to show a constitutional violation" where the record showed the investigating officer proceeded reasonably even while failing to complete a full investigation before issuing a criminal arrest warrant).

Plaintiffs also argue "[t]he facts of this case . . . show a concerted effort" by Defendants "to get Wendt and his hunting partners on some charge, really any charge."  Pls.' Resist. Br. 28, ECF No. 42.  Plaintiffs fail, however, to support this contention with evidence sufficient to establish Defendants recklessly or intentionally failed to investigate in a way that shocks the conscience.  Officers "may not be held liable merely for aggressively investigating the crime, believing witnesses, following leads, and discounting those pieces of evidence that do not fit with the evidence at the scene of the crime."  Winslow v. Smith, 696 F. 3d 716, 734 (8th Cir. 2012).

28

The record shows Defendants made reasonable decisions as they investigated Plaintiffs' involvement in criminal activity: trespass, use of cell phones to illegally hunt and take antlered deer, and illegally shooting deer from vehicles.  Any proof of their "negligent failure to investigate inconsistencies or other leads is insufficient to establish conscience-shocking misconduct." Akins, 588 F.3d at 1184.  Cf. Winslow, 696 F. 3d at 732-33 (finding "sufficient evidence to allow the reasonable inference that [the] [d]efendants recklessly investigated," which included "evidence that suggest[ed] Defendants systematically coached witnesses into providing false testimony that was in line with the narrative of the [d]efendants' theory as to how the murder had been committed").  Because Plaintiffs have failed to put forth evidence that would establish more than mere negligence, Defendants are entitled to qualified immunity as to Count II.[8]  It is also clear Defendants exercised "all due care to conform with the requirements of [Iowa] law" during the investigation and thus are also entitled to qualified immunity from Plaintiffs' state constitutional claim.[9]  Baldwin, 915 N.W.2d at 281; see also Dickerson, 547 N.W.2d at 215-16 (concluding the district court properly granted the defendant DNR officers' motion for summary judgment on the plaintiff's substantive due process claim finding the officers were entitled to

---

[8] Plaintiffs' claims against the State of Iowa are based on its liability for the conduct of its officers.  Because the Court finds officers King and Smith are entitled to qualified immunity, the State of Iowa is also entitled to immunity.  See, e.g., Baldwin v. City of Estherville, 929 N.W.3d 691, 696 (Iowa 2019) ("If the officers exercised due care in executing an ordinance, the City would be immune pursuant to section 670.4(1)(c).").

[9] Plaintiffs' claim is also alleged under article I, § 9 of the Iowa Constitution, but the parties did not brief this issue under Iowa law.  As this Court previously found, article I, § 9 mirrors the Fourteenth Amendment in providing "no person shall be deprived of life, liberty, or property, without due process of law."  Order 24, Wendt v. Iowa, No. 4:17-cv-00423 (S.D. Iowa July 26, 2018), ECF No. 28 (quoting Iowa Const. art. I, § 9); see Schmidt v. Des Moines Pub. Sch., 655 F.3d 811, 816 n.4 (8th Cir. 2011).  Therefore, the holding as to Count II applies equally to Plaintiffs' claim under article I, § 9 of the Iowa Constitution.

qualified immunity because the plaintiff failed to show the alleged unlawfulness of officers' actions was apparent or that the defendants acted unreasonably under the circumstances).

## III.   CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment, ECF No. 34, must be **granted**.  All counts against all Defendants are now disposed, and the case is **dismissed**.

**IT IS SO ORDERED.**

Dated this 23d day of September, 2019.

JAMES E. GRITZNER, Senior Judge
U.S. DISTRICT COURT